# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
May 18, 2015 Session

## SPRINGFIELD INVESTMENTS, LLC ET AL. v. GLOBAL INVESTMENTS, LLC ET AL.

### Appeal from the Chancery Court for Hamilton County
### No. 10-0497    W. Frank Brown, III, Chancellor

### No. E2014-01703-COA-R3-CV-FILED-AUGUST 27, 2015

This case involves a claim for, *inter alia*, intentional interference with business relationships.  The plaintiffs allege that the defendants, owners and operators of a franchise pursuant to an agreement with Wendy's Old Fashioned Hamburgers Restaurant ("Wendy's") in Cleveland, Tennessee, interfered with the plaintiffs' ability to timely secure a franchise agreement with Wendy's to build a new restaurant in Cleveland.  The plaintiffs alleged that the defendants improperly used a non-compete agreement, entered into in 1998 by the defendants and a brother of one of the plaintiffs, to object to Wendy's grant of the new franchise.  Following a bench trial, the trial court found, *inter alia*, that the plaintiffs failed to establish the claim of intentional interference with business relationships.  The court did enter a judgment, however, in favor of the plaintiffs for nominal damages in the amount of $500.  The plaintiffs have appealed.  Discerning no reversible error, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., C.J., and D. MICHAEL SWINEY, J., joined.

Everett L. Hixson, Jr., Adam U. Holland, and Everett L. Hixson, III, Chattanooga, Tennessee, for the appellants, Springfield Investments, LLC; Global Southern Realty Holdings, LLC; and Mohammed Abbasi, individually.

Cameron S. Hill and Marcie Kiggans Bradley, Chattanooga, Tennessee, for the appellees, Global Investments, LLC; Global Foods, LLC; Goul Group Management, Inc.; Jamal Alghoul, individually; and Kamal Alghoul, individually.

**OPINION**

**I. Factual and Procedural Background**

The individuals who are parties to this lawsuit and have controlling interest in the entities involved were not strangers to each other prior to the instant dispute. Plaintiff Mohammed Abbasi is a first cousin to Defendants Kamal Alghoul and Jamal Alghoul, who are brothers. At one time, all three men had worked together before developing their separate enterprises. Plaintiff Springfield Investments, LLC ("Springfield"), is a Georgia-based company that at the time of trial owned and operated seventeen Wendy's franchises located in Tennessee, Georgia, and Alabama. Plaintiff Global Southern Realty Holdings, LLC ("Global Southern"), owns or leases the real property on which Springfield builds its restaurants. Mohammed Abbasi owns a controlling interest in both Springfield and Global Southern (collectively, "Plaintiffs").

Defendant Global Foods, LLC ("Global Foods"), is a Tennessee-based company that owns and operates Wendy's franchises in Tennessee, including a franchise located at 925 25th Street in Cleveland ("25th Street Franchise"). Defendant Global Investments, LLC ("Global Investments"), is also a Tennessee-based company that owns and operates Wendy's franchises. Defendant Goul Group Management, Inc. ("Goul"), is a Tennessee-based corporation that manages both Global Foods and Global Investments. Jamal Alghoul and Kamal Alghoul ("the Alghouls"), own controlling interests in Global Foods, Global Investments, and Goul (collectively, "Defendants").[1]

In 1998, Yousef D. Abbasi, brother to Mohammed Abassi and also first cousin to the Alghouls, entered into a "Non-Compete Agreement" ("NCA") with Global Foods and Kamal Alghoul. It is undisputed that Mohammed Abassi, the owner with controlling interest in Springfield in 2010, was not a party to the NCA. The 1998 NCA provided in full:

Non-Compete Agreement

This Agreement between Yousef D. Abbasi an individual, and Global Foods, LLC (hereinafter referred to as "Buyer"), a limited liability company is made and entered into as of this 17th day of September, 1998.

Subject to the execution and consummation of the transactions contemplated of that certain Asset Purchase Agreement by and between

---

[1]Plaintiffs named Global Investments and the Alghouls as defendants in their original complaint. The trial court subsequently granted Plaintiffs leave to amend the complaint to add Global Foods and Goul as defendants. It is undisputed that Global Foods is the entity that actually owns the 25th Street Franchise.

Southern Foods, Inc. and Global Foods, LLC and in consideration of the amount of:

Two hundred seventy-five thousand dollars and zero cents ($275,000.00) payable to Yousef D. Abbasi, personally.

In exchange, Yousef D. Abbasi hereby agrees not to do any act or permit any act which would constitute the competition of Buyer's business by establishing other Wendy's restaurants in the Cleveland, Tennessee area with the exception of the Wendy's restaurant located at 1311 Paul Huff Parkway, Cleveland, Tennessee, owned by New World Services, LLC.

AGREED:

Yousef D. Abbasi, an Individual [signed]

Jamal Alghoul, Chief Manager [signed]
Global Foods, LLC

Twelve years later, Yousef Abbasi executed a "re-affirmation" of the NCA on April 6, 2010, and subsequently executed a "Clarification and Confirmation" of the NCA on May 8, 2010. These documents, both signed only by Yousef Abbasi, provided in turn:

Re-Affirmation of Non-Compete Agreement

The undersigned, Yousef D. Abbasi, hereby re-affirms that the Non-Compete Agreement dated September 17, 1998, for the benefit of Jamal Alghoul, a copy of which is attached hereto, remains in full force and effect and will not expire or terminate prior to my death.

Clarification and Confirmation of Non-Compete Agreement

The undersigned, Yousef D. Abbasi, hereby clarifies and confirms that the Non-Compete Agreement dated September 17, 1998, as supplemented by that certain Re-Affirmation of Non-Compete Agreement dated April 6, 2010, for the benefit of Global Foods, LLC, and its chief manager, Jamal Alghoul, copies of which are attached hereto, was provided and consideration was received by me for the purpose of giving assurances that neither I individually, nor any entities with which I was associated at the time that the Non-Compete Agreement was signed including, without limitation, Southern Foods, Inc. and Springfield Investments, LLC, or any

3

entities with which I subsequently became associated as an organizer, member, officer, director or shareholder would at any time take or permit to be taken any action which would result in the development and/or operation of Wendy's Restaurants in the Cleveland, Tennessee area which would compete with the Wendy's Restaurant owned and/or operated by Global Foods, LLC and/or Jamal Alghoul.

In January 2010, Plaintiffs began the process of seeking approval from Wendy's to build and develop a Wendy's restaurant at 2380 McGrady Drive in Cleveland ("McGrady Drive Franchise"). At approximately 4.8 miles away, Defendants' 25th Street Franchise was the closest existing Wendy's store to the proposed McGrady Drive site. All parties agree that the applicable development process for a new Wendy's franchise was governed by Wendy's written policy, "New Store Development Guidelines" ("Wendy's Guidelines"), particularly the version effective January 1, 2010. At trial, the parties stipulated to the authenticity of a large set of documents, which the trial court admitted into evidence as exhibits. These exhibits included a copy of Wendy's Guidelines, as well as copies of all correspondence described below. In order to track the parties' compliance with Wendy's Guidelines, we will cite sections of the Guidelines together with the parties' progress, respectively, in Plaintiffs' pursuing approval of the McGrady Drive Franchise and Defendants' seeking to oppose the new franchise.

Wendy's Guidelines provide that a franchisee or prospective franchisee ("Investigating Franchisee") shall begin the process of developing a new franchise by seeking a "Real Estate Letter" from Wendy's. The Guidelines describe this process as follows in pertinent part:

> **I.**A.   A real estate letter authorizes an Investigating Franchisee to look for real estate within a given area for a specific period of time. A franchisee or prospective franchisee must obtain a real estate letter prior to commencement of negotiations with a seller or landlord. Wendy's Real Estate Letter Request form must be used to initiate the request for a real estate letter . . . .

> \* \* \*

> **II.**   **Courtesy Letter:**   When a real estate letter is issued to an Investigating Franchisee, or when Wendy's begins the process of investigating an area to develop a company restaurant, Wendy's will send a letter ("Courtesy Letter") to each franchisee that Wendy's believes may be affected by the opening of a new restaurant. The Courtesy Letter is merely a courtesy notification that an

4

Investigating Franchisee or Wendy's, as the case may be, will be looking for a site for a new restaurant within a given area. There is no requirement or expectation by Wendy's that a franchisee respond to the Courtesy Letter.

On January 12, 2010, Plaintiff Global Southern, acting as the real estate arm of Plaintiff Springfield, submitted a Real Estate Letter Request to Wendy's for the McGrady Drive site. On February 3, 2010, Wendy's, acting through Gregory A. Hickman, Director of Franchise Development, issued a "Real Estate Letter," granting Springfield authorization "to investigate and locate for Wendy's consideration a real estate site" at 2380 McGrady Drive SE in Cleveland. Wendy's simultaneously sent Defendant Global Foods and the Alghouls a "Courtesy Letter," providing notice as described above of the Real Estate Letter issuance. Also on February 3, 2010, Global Southern entered into a ground lease with the sellers of the McGrady Drive site, with lease payments set to begin upon opening of a Wendy's restaurant at the site or, in any event, by October 1, 2010.

Once an Investigating Franchisee has located what it believes to be an acceptable site, as Plaintiffs had done with the McGrady Drive site, the Wendy's Guidelines require submission of a "Site Acceptance Request" ("SAR"). At this step in the process, Wendy's begins referring to the Investigating Franchisee as a "Developing Franchisee." The Guidelines then provide for notification to franchisees located nearby as follows in relevant part:

> **III.    Site Acceptance Request/Regional Preliminary Approval Notification:** . . . Following Wendy's receipt of a completed SAR, Wendy's will send certain franchisees, as described below, notice advising such franchisees of plans for development of a site-specific restaurant. Similarly, when Wendy's Regional Real Estate Department preliminarily approves a site for developing a company restaurant, Wendy's will send certain franchisees, as described below, notice advising such franchisees of plans for development of a site-specific company restaurant. For purposes of these Guidelines, the notice sent by Wendy's, in either case, is referred to as an "SAR Letter[."] Generally, an SAR Letter is sent to franchisees operating restaurants within a 5 mile radius of the proposed site.

This section of Wendy's Guidelines next delineates exceptions to the five-mile radius qualification for receiving notice and makes it clear that the decision of whether to send an SAR Letter to a particular franchisee is made at the discretion of Wendy's.

Plaintiff Springfield submitted a completed SAR to Wendy's on February 8, 2010. Concomitantly with the SAR, Mohammed Abassi sent a letter to Mr. Hickman, informing

5

him that two representatives from Wendy's had previously toured the McGrady Drive site and found it acceptable. In the meantime, Kamal Alghoul responded to his notice of the Real Estate Letter's issuance by sending Mr. Hickman a letter, dated February 9, 2010, in which he objected to the McGrady Drive Franchise on the basis that it would negatively impact business at the 25th Street Franchise. To clarify, Defendants had not yet received notification from Wendy's of Plaintiffs' completed SAR when Kamal Alghoul began communicating Defendants' objection to the site in response to having received notice of the Real Estate Letter.

The NCA first became an issue between Plaintiffs and Defendants in January to February 2010. Mohammed Abassi testified that he first learned of the NCA's existence in January 2010 during a telephone conversation with Jamal Alghoul. According to Mohammed Abassi, Jamal Alghoul told him that there was no way he could "put a foot in Cleveland because [Jamal Alghoul] has a no-compete agreement." Mohammed Abassi further testified that he asked Jamal Alghoul to send the NCA to him but that Jamal Alghoul did not provide it. Mohammed Abassi subsequently contacted his counsel at the time, Michael D. McRae. Mr. McRae drafted and sent to the Alghouls a letter, dated March 2, 2010, demanding that the Alghouls produce the purported NCA. He also warned them not to engage in any action that would obstruct or interfere with Plaintiffs' development of the McGrady Drive Franchise.

Defendants' former counsel, Ross I. Schram, III, responded to Plaintiffs' counsel with a letter, dated March 10, 2010, stating that the Alghouls had not communicated with Wendy's regarding the NCA but had lodged with Wendy's "their strong objection to the prospect of another Wendy's restaurant being approved for development in the Cleveland, Tennessee trade area." Defendants still did not provide Plaintiffs with a copy of the NCA. At trial, Plaintiffs presented no admissible proof to indicate that Wendy's officials had any knowledge of the NCA at this point in the process. Kamal Alghoul did not mention the NCA in his February 9, 2010 letter to Mr. Hickman.

Wendy's Guidelines further provide an objection process for an existing franchisee who receives notice through receipt of an SAR Letter of a developing franchisee's plans to open a new Wendy's restaurant. The Guidelines describe this process in pertinent part as follows:

> IV. **Objection to Proposed Development:** A franchisee who receives an SAR Letter and believes that the new restaurant will unreasonably impact one or more of the franchisee's existing restaurants located within the scope of the SAR Letter may object to the development of the proposed site (the "Objecting Franchisee"). In order to object, the Objecting Franchisee must complete a Sales

Transfer Analysis Data Form, a copy of which is attached to these Guidelines as Exhibit C (the "Objection Notice"), for each restaurant the Objecting Franchisee believes will be impacted by the new restaurant. The Objecting Franchisee must then send the Objection Notice to Wendy's Franchise Development Department by any means that provides the Objecting Franchisee with evidence that the Objection Notice was sent. The Objection Notice, among other things, sets forth the logic or reasons why the Objecting Franchisee believes a new restaurant at the proposed site will unreasonably impact sales at the Objecting Franchisee's existing restaurant(s).

    A.    The Objecting Franchisee must provide Wendy's the signed Objection Notice within 21 days after receipt of the SAR Letter.

On March 19, 2010, Wendy's, through Mr. Hickman, sent Defendants notice that Plaintiffs had submitted an SAR for the proposed McGrady Drive Franchise. Mr. Hickman did not reference in this "SAR Letter" Kamal Alghoul's prior correspondence objecting to the issuance of the Real Estate Letter. Mr. Hickman explained to Defendants that according to Wendy's Guidelines, they had twenty-one days to submit a Sales Transfer Analysis Data Form ("Objection Notice") if they wished to object to the proposed new franchise. On April 9, 2010, Defendants submitted a timely Objection Notice, basing their objection on what they estimated would be a 15% to 20% negative impact, or "cannibalization" of the 25th Street Franchise's profits by the proposed McGrady Drive Franchise. Defendants did not mention the NCA in their Objection Notice.

Wendy's Guidelines provide as the next step in the process that the Developing Franchisee will be advised of the Objection Notice and may respond to it as explained below:

    **V.**    **Developing Franchise Advised:** Within 7 days following receipt of an Objection Notice to a Developing Franchisee's SAR, Wendy's Franchise Development Department will advise the Developing Franchisee in writing of the objection and will also provide the Developing Franchisee with a copy of the Objection Notice. Within 7 days after being notified of the Objection Notice, the Developing Franchisee may send a written response to the Objection Notice to Wendy's Franchise Development Department.

Plaintiffs presented electronic mail correspondence demonstrating that Plaintiff Springfield's Vice President, Thomas Bradford, inquired into the progress of the SAR on March 24, 2010, and was informed by Joseph B. Keith, Wendy's Director of Development for the South Region, that Wendy's had sent an SAR letter to Defendants and was required by Wendy's Guidelines to give Defendants twenty-one days to respond. Following Defendants' submission of the Objection Notice, Cindy Wallace, Senior Franchise Development Specialist for Wendy's, sent Mohammed Abbasi written notification that Wendy's had received an objection to the proposed McGrady Drive Franchise. Ms. Wallace asked Mohammed Abbasi to provide "written comments regarding the concerns raised by the objecting party by April 19, 2010." On April 13, 2010, Mohammed Abbasi submitted a written response, asserting that Defendants' concerns regarding the impact of the McGrady Drive Franchise on their existing franchise were unfounded and that the area could support both store sites.

Once an SAR has been submitted, Wendy's Guidelines provide the following procedure in relevant part:

> **VI.     SAR – Site Visit:**  Following receipt of an SAR, Wendy's real estate personnel will visit the proposed site.  If Wendy's receives an Objection Notice in response to an SAR Letter regarding a Developing Franchisee's proposed site, then Wendy's real estate personnel will visit the proposed site within 45 days of receipt of the Objection Notice.  Following that visit, the real estate personnel will advise the Regional Development Director and the Franchise Development Director of preliminary acceptance or rejection of the proposed site and the reason for such decision.  A site visit is not necessary when the Objection Notice is in response to an SAR Letter regarding a Wendy's company proposed site.

> **VII.   Initial Decision:**  Within 14 days following the site visit discussed in Item VI, Wendy's personnel (Regional Development Director, Franchise Development Director, and/or Division Vice President) will hold discussions with the Developing Franchise regarding the viability of the proposed site.  If an Objection Notice is pending, then there will be discussions with the Objecting Franchisee regarding the possible impact resulting from the proposed development.  If the proposed site is a Wendy's company site and an Objection Notice is pending, then the same discussions will take place with only the Objecting Franchisee.  Wendy's will then advise the Developing Franchisee and the Objecti[ng] Franchisee, if applicable, in writing of Wendy's decision regarding the proposed site.

> * * *

8

C.     If there is an Objection Notice pending and Wendy's initial decision is to approve development of the proposed site, then the Objecting Franchisee can proceed to either Item VIII or to Item IX.  If the Objecting Franchisee takes either of those actions, then Wendy's will not take any action in response to Wendy's initial decision until the Objecting Franchisee's appeal rights are exhausted.

D.     If Wendy's decision is to disapprove the development of the proposed site, then Wendy's will consider the matter closed.

E.     Approval of a Developing Franchisee's SAR is not a grant of franchisee rights or intent to grant franchise rights.

## VIII.  Request for Third-Party Impact Analysis:

A.     In the event Wendy's notifies an Objecting Franchise that Wendy's approved the development of a proposed site, the Objecting Franchise may request that a third-party perform an impact analysis.  Such request must be submitted in writing to Wendy's Franchise Development Department within 14 days following receipt of notice of Wendy's initial decision to approve of the development of the proposed site.  In the alternative, the Objecting Franchisee can proceed directly to an appeal to Wendy's Regional Senior Vice President (the "Regional SVP") as contemplated in Item IX, provided the Objecting Franchisee provides written notice of that decision to Wendy's Franchise Development Department within the same 14 day period referenced in the preceding sentence.

B.     Only third-parties approved by Wendy's from time to time can perform impact analysis (i.e., currently approved third-parties are Pitney Bowes Business Insight and HN Research, LLC).

C.     After receiving an impact analysis request from an Objecting Franchisee, Wendy's will provide the Objecting Franchisee any data forms that the third-party requests be completed in order to assist the third-party in performing the impact analysis.  The Objecting Franchisee must complete the data forms and return them to Wendy's along with a check made payable to Wendy's equal to the amount the third-party charges for performing the analysis.  Wendy's will then order the impact analysis from the third-party and will remit payment to the third-party for performing the analysis.  The amount paid by the Objecting Franchisee to Wendy's for the

impact analysis may be fully or partially refunded to the Objecting Franchisee depending on the results of the analysis as contemplated below.

D.      Once the third-party completes the impact analysis, Wendy's will provide a copy of the impact analysis completed by the third-party to the Objecting Franchisee and to the Developing Franchisee, if applicable.

* * *

G.      The impact analysis is not the determining factor as to whether or not to approve the development of the proposed site, and Wendy's is not bound by the results of the analysis.

H.      Following completion of the third-party impact analysis, the process automatically proceeds to the first level appeal (Item IX).

## IX.    First Level Appeal – Regional SVP:

A.      The Regional SVP will determine whether or not to approve the development of the proposed site.  This decision will be based upon various factors, including, among other things, the third-party impact analysis (if obtained), market penetration, competition for the proposed site, the condition of the Objecting Franchisee's existing restaurants and the operations level of the Objecting Franchisee's existing restaurants.  Plans may also be formulated, if appropriate, to minimize effects of any potential impact to the Objecting Franchisee's existing restaurants.

B.      The Regional SVP will notify the Objecting Franchisee and the Developing Franchisee, if applicable, in writing of the decision regarding the proposed site.  If the decision is to approve development of the proposed site, then the Objecting Franchisee can proceed to the second level appeal (Item X).  If the Objecting Franchisee does not proceed to the second level appeal (Item X), then Wendy's will implement the Regional SVP's decision as if there is not an Objection Notice pending as described in subsections A. and B. of Item VII.

C.      If the Regional SVP's decision is to disapprove the development of the proposed site, then Wendy's will consider the matter closed.

**X.     Second Level Appeal – Wendy's Senior Management:**

A.     If the Regional SVP approves the development of the proposed site, then the Objecting Franchisee may submit a written request for an appeal of that decision to Wendy's Franchise Development Department.  A request for this appeal must be submitted within 7 days after the Objecting Franchisee receives notification of the Regional SVP's decision to approve development of the proposed site.

B.     The appeal submitted by an Objecting Franchisee at this level will be decided by Wendy's President and/or Wendy's Senior Vice President, Business Development ("Wendy's Management").   The decision by Wendy's Management will be based upon a review of the factors and information considered by the Regional SVP in making a decision and upon any other information that Wendy's Management deems pertinent.

C.     Wendy's Management will notify the Objecting Franchisee and the Developing Franchisee, if applicable, in writing of the decision regarding the proposed site.   If the decision is to approve development of the proposed site, then Wendy's will implement Wendy's Management's decision as if there is not an Objection Notice pending as described in subsections A. and B. of Item VII, and there are no more opportunities for the Objecting Franchisee to oppose the development of the proposed site.

D.     If Wendy's Management's decision is to disapprove the development of the proposed site, then Wendy's will consider the matter closed.

On May 5, 2010, Mr. Hickman notified Defendants by letter that having completed a successful site inspection, Wendy's was granting approval to Plaintiffs for development of the McGrady Drive Franchise.  Mr. Hickman also informed Defendants through this letter that pursuant to Wendy's Guidelines, Defendants could pursue their objection by either requesting a third-party impact analysis, complete with submission of requisite forms and payment, within fourteen days of the letter's receipt or by requesting a first-level appeal within the same timeframe.  Regarding a first-level appeal, Mr. Hickman explained the following:

> As an alternative to the impact analysis, you may skip that step entirely (and the expense associated with the third-party analysis) and appeal the matter to the Senior Regional Vice President directly within the 14 day period.  This can be done simply by sending a letter to Wendy's

Franchise Development Department (with a copy to Ed Austin, Senior Vice President) requesting an appeal. You must, however, ensure that the letter is underline received within 14 days of this receipt.

(Emphasis in original.)

On May 10, 2010, five days after receiving notification of the McGrady Drive Franchise's preliminary approval, Kamal Alghoul met with several Wendy's officials at their office in Atlanta. At trial he testified that in requesting the meeting, he was exercising what he believed to be his rights as the Objecting Franchisee to enter a discussion with Wendy's regarding the potential impact of the proposed franchise on his existing franchise. Kamal Alghoul further testified that although the main objection he voiced during this meeting was that the McGrady Drive Franchise would negatively impact business at the 25th Street Franchise, he did also present the NCA, inclusive of all three documents executed by Yousef Abbasi, to Wendy's officers for their consideration. Kamal Alghoul acknowledged that at this point Wendy's representatives reviewed the NCA. When Wendy's officers requested that Kamal Alghoul leave a copy of the NCA documents with them, he declined to do so until and unless Wendy's requested a copy in writing. According to Kamal Alghoul, the May 10, 2010 meeting was the first time that Wendy's personnel learned of the NCA, and Plaintiffs presented no admissible evidence that Wendy's knew of the NCA any earlier.

Through Mr. Hickman, Wendy's subsequently sent Defendants a letter, dated May 13, 2010, directing them to produce the NCA "and all relevant documents concerning [their] rights to prevent Mr. Abbasi from constructing another Wendy's in Cleveland, and your clear intent to legally enforce any such rights by Wednesday, May 19, 2010." On May 18, 2010, attorney Schram, acting on behalf of Defendants, sent a letter to Ed Austin, Senior Regional Vice President of Wendy's, expressing Defendants' objection to the preliminary approval of the McGrady Drive Franchise and requesting a first-level appeal. He attached copies of the three NCA documents. Mr. Shram in this letter further stated:

There are two separate reasons upon which Objecting Franchisee's [Defendants'] objections are based. The first involves the adverse financial impact which development of the proposed site by any franchisee or by Wendy's as a company store would have on their existing store #3670 located at 925 25th Street in Cleveland. The second reason addresses the Non-Compete Agreement which prohibits the Developing Franchisee [Plaintiffs] from establishing a Wendy's restaurant in Cleveland, Tennessee.

12

\* \* \*

      In addition to the foregoing, Objecting Franchisee hereby notifies Wendy's that development of the site by Developing Franchisee is governed and restricted by the terms of a Non-Compete Agreement which has been in effect since September 17, 1998. The Non-Compete Agreement was entered into two years after Developing Franchisee was organized as a limited liability company in Georgia in January 1996 by Yousef Abbasi and Mohammed Abbasi for the purpose of developing Wendy's restaurants. The $275,000 paid by our clients to Yousef Abbasi was intended to restrict any further development of Wendy's restaurants in Cleveland, Tennessee, except for the 1311 Paul Huff Parkway location, by Yousef Abbasi and those entities with which he was associated or would become associated as an organizer, member, officer, director or shareholder including Southern Foods, Inc. and Springfield Investments, LLC. A copy of the Non-Compete Agreement, as re-affirmed and clarified and confirmed is also enclosed for your review.

      Please be advised that Objecting Franchisee intends to enforce its rights under the Non-Compete Agreement against anyone who would seek to initiate and/or authorize actions which violate the terms thereof.

      Based upon the foregoing, our clients do not believe that it is appropriate to proceed with the Third-Party Impact Analysis at this time. However, in the event that the First Level Appeal process does not result in the disapproval of the development of the proposed site, Objecting Franchisee would request that an opportunity be afforded to have a Third-Party Impact Analysis performed prior to commencement of the Second Level Appeal.

In terms of Wendy's procedures, Defendants thus selected the option of a first-level appeal while also attempting to reserve their right to request a third-party impact analysis, the option that Mr. Hickman had explained they would "skip" if they proceeded directly to a first-level appeal.

 Wendy's Senior Vice President and Associate General Counsel Larry Nelson responded to Defendants through Mr. Schram in a letter dated May 27, 2010. Mr. Nelson stated in relevant part:

      With respect to the Noncompete Agreement dated September 17, 1998, we are continuing to review the matter. In any event, Wendy's

13

reserves its right to respond to our franchisee's request for development as it deems appropriate.

With respect to impact concerns, the Regional SVP has examined the circumstances related to the proposed site. He believes the proposed site is viable. On that basis, the Company is prepared to proceed with consideration of the above-referenced site (subject to any decision related to the Noncompete Agreement).

Regarding Wendy's development process, it is clear that you have failed to follow that process with respect to a third party impact analysis (which should precede the First Level Appeal to the regional SVP). Even though you have elected to skip that step in the process, per your request, we are prepared to allow for that analysis if you act promptly. However, be advised that Wendy's reserves all of its rights and will not be limited in any way by the failure to follow the process. Also, please keep in mind that the impact analysis is not the determining factor as to whether or not to approve the development of a proposed site.

If you wish to obtain an impact study, it is imperative that you (or Mr. Alghoul) deliver to me within 10 days of the date hereof 1) the Request for Third Party Impact Study (as provided to Mr. Alghoul in Wendy's letter dated May 5, 2010); 2) the completed data form (as provided to Mr. Alghoul in Wendy's letter dated May 5, 2010); and 3) a check in the amount of $4,800.00 (made payable to Wendy's).

We look forward to the timely receipt of this information if you wish to obtain the impact analysis. Separately, we will continue to review circumstances related to the noncompete issue which you have raised.

Wendy's thus treated Mr. Schram's May 18, 2010 letter as a request for both a first-level appeal and a third-party impact analysis and set forth the procedure, with a time extension, for Defendants to seek both forms of relief, provided they sought the third-party impact analysis first, as provided by Wendy's Guidelines.

In response to Mr. Nelson's May 27, 2010 letter, Mr. Schram contacted Mr. Nelson by telephone. In subsequent electronic mail correspondence, dated June 11, 2010, Mr. Nelson summarized their discussion as follows:

In response to my letter to you dated May 27, 2010, you asked me if Wendy's could address the impact issue (and receive the $4,800 fee

14

referenced in my letter) **after** its determination of the noncompete and thereby avoid an expense for your client that may not be necessary. I advised you that Wendy's was not intending to make a legal decision on the noncompete issue and that we viewed it as a matter to be resolved by the two franchisees. I told you that my hope was that it would be resolved (hopefully amicably) through negotiations, arbitration or otherwise, but that Wendy's was not going to make the legal decision on the enforceability of that agreement.

I also advised you that the impact analysis was our issue as franchisor, and that it was part of our impact guidelines and therefore we were viewing it as separate from this noncompete matter. For that reason we were intending to proceed with the impact process as set forth in my letter to you. I agreed (per your request) to give you a bit more time to make that payment and submit the forms which you later documented in an email to me.

Wendy's remains concerned about issuing franchise rights in the midst of such uncertainties. Whether or not we are prepared to do so remains to be seen, but it is not accurate to suggest this issue and the objections made in your letter to Mr. Austin are not at all a consideration for Wendy's.

We would again strongly encourage both of our franchisees to get together and resolve this matter quickly and amicably.

On June 7, 2010, Defendants submitted the requisite forms and payment to obtain a third-party impact analysis. Wendy's subsequently informed Plaintiffs on June 10, 2010, that pursuant to Defendants' request, a third-party impact analysis was pending.

Plaintiffs commenced the instant action in the trial court on June 8, 2010, by filing a complaint, alleging that Defendants had tortiously interfered with Plaintiffs' business relations with Wendy's. Plaintiffs simultaneously filed a motion for a temporary restraining order, which the trial court immediately granted. In its restraining order, the court temporarily enjoined Defendants from "in any manner, utilizing or referencing or relying or causing others to rely upon or to infer that any document purporting to be a covenant not to compete is valid or otherwise binding upon any of the Plaintiffs, pending further Order of this Court." In his June 10, 2010 electronic mail correspondence with Mr. Nelson, Mr. Schram acknowledged Defendants' receipt of the temporary restraining order and expressed their intent to follow it and refrain from discussing the NCA with Wendy's. The trial court subsequently entered an agreed order extending the temporary restraining order on June 18, 2010. This agreed order was still in effect at the time of trial.

On July 9, 2010, Wendy's provided Defendants and Plaintiffs, respectively, with the results of the requested impact analysis. These results identified an "Encroachment Study" conducted by HN Research and showed a conclusion that the McGrady Drive Franchise would have a projected negative impact of seven percent on the 25th Street Franchise's profits. Pursuant to Wendy's Guidelines, because the impact result was between five percent and ten percent, the Developing Franchisee and the Objecting Franchisee were to equally divide the $4,500 cost of the study.[2] Wendy's therefore required a check from Plaintiffs in the amount of $2,250 and supplied a refund check to Defendants in the amount of $2,250.

On July 19, 2010, Mr. Keith notified Plaintiffs via letter that Wendy's was officially accepting the McGrady Drive location as a real estate site for development. Mr. Keith reiterated further requirements pursuant to Wendy's Guidelines for franchise approval in relevant part:

> The acceptance is contingent upon receipt and acceptance by Wendy's International, Inc. of your final site plan. Approval of your final site plan is required for FRC Approval.
>
> * * *
>
> The real estate acceptance does not constitute the grant of franchise rights nor is it intended to suggest that such rights will necessarily be granted to you. Please contact the Franchise Director to discuss presenting your request for franchise rights before the Franchise Review Council.

Wendy's also provided notice of the real estate acceptance to Defendants on the same date.

Regarding the status of the NCA dispute, Mr. Nelson, acting on behalf of Wendy's, contacted Plaintiffs' counsel on July 22, 2010, three days after Wendy's had issued official acceptance of the proposed real estate site. The following electronic mail exchange ensued in relevant part:

---

[2] The amount of $4,800 quoted earlier to Defendants by Wendy's was apparently in error.

Mr. Nelson to Plaintiffs' Counsel:

It is my understanding that the lawsuit between the above parties has been dismissed. Please confirm the status of this matter and provide any court documents reflecting that status in connection with the proposed site.

Plaintiffs' Counsel to Mr. Nelson:

While it is accurate to say that the alleged covenants not to compete have been removed from the dispute between the parties, the case has not been dismissed as Mr. Abbasi still has a claim for damages against Global Foods and the Alghouls as a result of their use of the purported covenants in an effort to delay of [sic] prevent his development. Please see the attached Restraining Order entered against them and the Agreed Order signed by their counsel to this effect.

If the case must be completely dismissed in order for Mr. Abbasi to be allowed to proceed with you, please advise. The pending issues, however, in no way involve Wendy's.

The record contains no further reply from Mr. Nelson.

In response to Wendy's approval of the McGrady Drive location as a real estate site, Kamal Alghoul sent Mr. Hickman a letter protesting the decision and explaining why he believed the results of the impact analysis to be flawed. Wendy's treated this letter as a second-level appeal under Wendy's Guidelines. On August 10, 2010, Kris A. Kaffenbarger, Wendy's Senior Vice President of Business Development, sent Defendants a letter notifying them that their second-level appeal had been denied. Mr. Kaffenbarger stated specifically in relevant part:

> This letter is written in response to your letter to Gregory Hickman dated July 29, 2010, requesting a second-level appeal pertaining to the development of a new Wendy's restaurant by Springfield Investment, LLC ("Springfield") in Cleveland, Tennessee. Wendy's has carefully reviewed your objections and issues related to the proposed development. After analyzing the relevant factors, Wendy's has decided to continue to proceed with allowing Springfield to develop the site located at [2380] McGrady Drive, Cleveland, TN. Although your appeal rights under Wendy's New Store Development Guidelines are now exhausted, you are still entitled to make an impact claim, if applicable, after the one-year anniversary date of the opening of the new Wendy's.

17

The impact claim referenced by Mr. Kaffenbarger is available under section XIII of Wendy's Guidelines to an objecting franchisee that, following at least one year's operation of the newly developed franchise at issue, is shown to have been negatively impacted by the new franchise in an amount "above the acceptable base level of impact for the applicable time period."

Upon the denial of Defendants' second-level appeal, Plaintiffs did not yet possess full franchise rights in the McGrady Drive Franchise. According to section XI of Wendy's Guidelines, Plaintiffs still had to "(i) be granted franchise rights for the SAR approved site from the Wendy's Franchise Review Council, (ii) execute the current form of the Franchise Agreement and return the executed Franchise Agreement to Wendy's Legal Department, and (iii) pay Wendy's the technical assistance fee required in connection with obtaining franchise rights." Following completion of these requirements, Wendy's ultimately executed a Unit Franchise Agreement with Plaintiffs for the McGrady Drive Franchise on September 30, 2010. Plaintiffs obtained construction permits for the location on December 30, 2010. Following several construction delays, which Plaintiffs assert were the result in great part of the delay caused by Defendants' use of the NCA, the McGrady Drive Franchise was completed and opened for business on June 8, 2011.

Approximately two years after the initial complaint had been filed in the trial court, Plaintiffs filed a motion to amend the complaint on July 10, 2012. As relevant to this appeal, Plaintiffs sought to maintain their claims for declaratory judgment and tortious interference with contract while requesting that the temporary restraining order prohibiting Defendants' use of the NCA against Plaintiffs remain in effect. Plaintiffs also asserted that they had suffered compensable damages, to be determined at trial, due to Defendants' actions in "unreasonably and unnecessarily" delaying the opening of the McGrady Drive Franchise.

Defendants filed an answer on September 27, 2013. On March 20, 2014, Plaintiffs filed a second motion to amend the complaint, in part to add Global Foods and Goul as defendants and to allege several additional facts. Plaintiffs again sought declaratory judgment regarding the NCA. They delineated their causes of action as (1) tortious interference with existing and/or prospective business relationships,[3] (2) wrongful inducement of breach of contract with Wendy's pursuant to Tennessee Code Annotated § 47-50-109 (2013), and (3) breach of contract, asserting, *inter alia*, that Defendants owed Plaintiffs "a contractual duty to act in good faith, free of malice and malicious intent, in

---

[3] Our Supreme Court expressly adopted the "tort of intentional interference with business relationships" in *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002). We will therefore use this terminology throughout our analysis.

exercising their rights under the [Wendy's] Development Guidelines to object to the development of the McGrady Drive Franchise" and that Defendants owed Wendy's "a contractual duty to act in good faith by refraining from making any fraudulent or bad faith objections to the development of a new Wendy's franchise." Plaintiffs sought compensatory damages, as well as treble damages for the statutory claim under Tennessee Code Annotated § 47-50-109. The trial court granted Plaintiffs' second motion to amend the complaint in an order entered April 21, 2014.

Although the amended complaint did not specify an amount of requested damages, Plaintiffs argued at trial that they were entitled to compensatory damages for lost net profits, six months of rent paid on the ground lease prior to the store's opening, loss of a time-sensitive construction discount, and additional construction costs incurred when the Tennessee Department of Transportation ("TDOT") modified McGrady Drive in the spring of 2011. On appeal, Plaintiffs identify the total amount of compensatory damages requested as $419,105.

Following a bench trial conducted over the course of three days on April 10 and 11, 2014, and May 7, 2014, the trial court concluded that Plaintiffs failed to establish a claim for breach of contract or a statutory claim for inducement of breach of contract under Tennessee Code Annotated § 47-50-109. Plaintiffs have not raised issues regarding the court's findings on these two contract claims. As relevant to this appeal, the court found that Plaintiffs failed to establish the tort of Defendants' intentional interference with Plaintiffs' business relationship with Wendy's. The court did find, however, that Plaintiffs were entitled to "nominal" damages in the amount of $500. The court entered a Memorandum Opinion and Order on May 28, 2014.

On June 20, 2014, Plaintiffs filed a Tennessee Rule of Civil Procedure 59.04 motion to alter or amend the judgment, averring that the trial court had failed to address their claim of interference with business relationships, as well as their request for declaratory judgment. Defendants subsequently filed a response, arguing that the Memorandum and Opinion was a final judgment addressing all claims not pretermitted as moot. Defendants specifically asserted in reference to the declaratory judgment claim that "Plaintiffs cannot now complain that the Court did not address a claim they indicated was no longer on the table." Following a hearing conducted on July 21, 2014, the trial court denied Plaintiffs' motion to alter or amend the judgment. On August 4, 2014, the court entered a final Memorandum Opinion and Order, incorporating the previous Memorandum Opinion and Order, and further clarifying its findings. Plaintiffs timely appealed.

19

## II. Issues Presented

Plaintiffs present three issues on appeal, which we have restated slightly as follows:

1.    Whether the trial court erred by finding that the enforceability of the NCA was not an issue for adjudication.

2.    Whether the trial court erred by dismissing Plaintiffs' claim for intentional interference with business relationships.

3.    Whether the trial court erred by finding that Plaintiffs failed to prove damages.

## III. Standard of Review

Our review of the trial court's judgment following a non-jury trial is *de novo* upon the record, with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006) (citing *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001)). We review the trial court's conclusions of law *de novo* with no presumption of correctness. *Hughes v. Metro. Gov't of Nashville & Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011). While "the amount of damages to be awarded in a particular case is essentially a fact question," "the choice of the proper measure of damages is a question of law." *GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 541 (Tenn. Ct. App. 2005). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

## IV. Non-Compete Agreement

Plaintiffs contend that the trial court erred by finding that the enforceability of the NCA was not tried by the parties and was therefore not an issue for adjudication. Plaintiffs assert that an exchange of correspondence between the trial court and counsel for both parties following the first two days of trial and prior to the close of trial was "confusing" to the trial court. Plaintiffs specifically state on appeal:

[T]he Trial Court apparently inferred that Appellants' steadfast assertions that the NCA was not binding on them, coupled with the absence of any attempt by Appellees to validate [the] NCA, was the equivalent of asserting that Appellees' malicious use of the NCA was not an issue to be tried and was not before the Trial Court.

Upon our thorough review of the record, we disagree.

Subsequent to Plaintiffs' filing the notice of appeal, Defendants filed copies of correspondence, noted in the court's final order, between the trial court and counsel for all parties. The correspondence was dated April 13, 2014, and April 14, 2014, following completion of the first two days of trial on April 10, 2014, and April 11, 2014. Trial concluded on May 7, 2014, with further presentation of testimony and closing arguments. The correspondence states in relevant part:

**April 13, 2014  [via facsimile]**

**To:**          **[Plaintiffs' Counsel]**
               **[Defendants' Counsel]**

**[From:          Trial Court]**

**Re:     *Springfield Investments, LLC, et al. v. Global Investments [Foods], LLC, et al., No. 10-0497***

**\* \* \***

Am I correct that the NCA is off the table as a legal issue as to viability, applicability and the only claim of Plaintiffs is to damages for the delay cause[d] Pls. in obtaining a new franchise & opening the new store on McGrady Drive, which in part allegedly resulted from the Ds' use, reliance, etc. of the alleged NCA?

\* \* \*

**April 14, 2014 [via hand delivery]**

Dear [Trial Court]:

A copy of this letter is being sent to opposing counsel.

In response to the question in your April 13, 2014 fax, regarding whether there is currently a dispute between the parties regarding the legality of the Non-Compete Agreement ("NCA"), we believe you are correct that this is no longer an issue. A temporary restraining order ("TRO") was issued on June 8, 2010, and Ross Schram informed Wendy's on June 10, 2010 that Defendants fully intended to comply with the TRO. *See* Trial Exhibits 27 & 28. On June 18, 2010, Defendants also agreed to extend the TRO. *See* Agreed Order Extending Temporary Restraining Order. Accordingly, as you indicated, Plaintiffs' only remaining claim is for alleged damages due to the delay Plaintiffs contend that Defendants caused by objecting to the opening of the new Wendy's restaurant at McGrady Drive under Wendy's New Store Development Guidelines.

Please let me know if you have any questions.

Cordially,
[Defendants' Counsel]

* * *

**April 14, 2014 [via hand delivery]**

Dear [Trial Court]:

I have and thank you for your letter of April 13 regarding the captioned matter and your inquiry regarding the status of the NCA.

* * *

You are correct that the NCA is "off the table" as a legal issue as to viability and applicability. The Agreed Order extending the terms of the Temporary Restraining Order removed the NCA from consideration, and it remains off the table in that the parties never modified that Agreed Order. Plaintiffs' damage claims relate to the delay caused by Defendants' use of the NCA as stated in your letter of April 13.

Thank you for your attention to this matter and please let me know if you have any further questions. In the meantime, I remain

Very truly yours,

[Plaintiffs' Counsel]
[copied to opposing counsel]

Plaintiffs' argument regarding this issue is based on a statement made by the trial court in its May 2014 Memorandum Opinion and Order that "Plaintiffs would have prevailed on the NCA issue if the issue had been tried." As Defendants note, however, the trial court's judgment, read as a whole, indicates the court's clear understanding that the key issue before it was whether Defendants' use of the NCA within their objection to the McGrady Drive Franchise constituted intentional interference with Plaintiffs' business relationship with Wendy's. The court based its determination that Plaintiffs had failed to prove the elements of intentional interference with business relationships on its finding that Plaintiffs had failed to prove damages caused by Defendants' use of the NCA. The court specifically found that Defendants' use of the NCA caused no delay in Wendy's franchise approval process beyond the delay accounted for by the objection process allowed by Wendy's Guidelines.

As to the enforceability of the NCA, Defendants at no time during the trial attempted to claim that the NCA could be used validly to prevent Plaintiffs from developing a Wendy's franchise in Cleveland. In contrast to such a position, the temporary restraining order, extended by agreement of all parties in an order entered June 18, 2010, remained in place at time of trial. As the trial court noted in its August 2014 Memorandum Opinion and Order, the restraining order "restrained the Defendants from taking the position with others that the NCA was valid or binding upon the Plaintiffs."

It is well settled in Tennessee that although covenants not to compete are "disfavored by law," they are "'valid and will be enforced, provided they are deemed reasonable under the particular circumstances.'" *Money & Tax Help, Inc. v. Moody*, 180 S.W.3d 561, 565 (Tenn. Ct. App. 2005) (quoting *Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361, 363 (Tenn. 1966)). In the instant action, however, Defendants did not dispute that Plaintiffs were not parties to the NCA at issue and therefore could not be bound by it. We conclude that the trial court properly considered Defendants' presentation of the NCA to Wendy's only within the context of whether that presentation interfered with the business relationship between Plaintiffs and Wendy's.

IV. Intentional Interference with Business Relationships

Plaintiffs contend that the trial court erred by determining that Plaintiffs failed to prove their claim for intentional interference with business relationships upon the court's finding that any delay in Wendy's approval of the McGrady Drive Franchise was caused

23

by Wendy's process for reviewing objections lodged by owners of nearby Wendy's franchises. Plaintiffs argue that Defendants maliciously used a fraudulent NCA to cause delay and that they abused the process under Wendy's Guidelines in a manner denoting bad faith. Apart from use of the NCA, Plaintiffs' argument in this regard is also based on Defendants' request to reserve the right to obtain an impact analysis when Wendy's Guidelines direct that the objecting franchisees should either request an impact analysis or proceed to a first-level appeal letter. Defendants contend that the trial court correctly found that any appreciable delay in Wendy's approval process was due to the objection process allowed by Wendy's pursuant to its Guidelines, inclusive of the extension of time Wendy's granted Defendants to request an impact analysis. We determine that the evidence does not preponderate against the trial court's finding that the claim should be dismissed.

## A. Elements of Claim

In order to succeed in a claim for intentional interference with a business relationship, a plaintiff must demonstrate:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's *improper motive or improper means*[;] and finally, (5) damages resulting from the tortious interference.

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (emphasis in original) (footnotes and internal citation omitted). Regarding a "definition" of "improper motive or improper means" in this context, the *Trau-Med* Court explained:

> It is clear that a determination of whether a defendant acted "improperly" or possessed an "improper" motive is dependent on the particular facts and circumstances of a given case, and as a result, a precise, all-encompassing definition of the term "improper" is neither possible nor helpful. However, with regard to improper motive, we require that the plaintiff demonstrate that the defendant's predominant purpose was to injure the plaintiff. *See Leigh Furniture & Carpet Co.* [*v. Isom*], 657 P.2d [293,] 307-08 [(Utah 1982)].

*Id.* at 701 n.5.

24

In its August 2014 Memorandum Opinion and Order, the trial court summarized its findings regarding this issue in relevant part as follows:

> The court's bottom-line consists of three points. One, the Defendants' attempt to use an invalid NCA to stop Plaintiffs' request for a new franchise was unsuccessful. Two, the Plaintiffs have not shown that the Defendants' attempt to interject the NCA into the discussions delayed Wendy's ultimate approval. Thus, without proving that the delay or the lengthy approval process was due to the NCA, as opposed to Wendy's allowance of nearby franchisees to object to and appeal decisions regarding a proposed new restaurant, Plaintiffs cannot prove damages. Three, the only possible proof of Defendants' use of an "improper motive or improper means," was their attempt to use the NCA.

The trial court therefore based its dismissal of the claim on its finding that Plaintiffs had failed to prove damages attributable to Defendants' use of the NCA. It is undisputed that (1) Plaintiffs had an existing business relationship with Wendy's and that (2) Defendants knew of the relationship between Plaintiffs and Wendy's. As to the remaining elements of the claim, the trial court found that (3) for approximately one month, Defendants improperly interjected an invalid NCA into the objection process and that (4) specifically, Kamal Alghoul's intent in doing so may have been to interfere with Plaintiffs' ability to obtain franchise rights from Wendy's to the proposed McGrady Drive Franchise. Regarding the final required element of damages, however, the trial court expressly found that Plaintiffs failed to prove that improper actions by Defendants, particularly use of the NCA, extended the time period allowed for objections under Wendy's Guidelines.

For this reason, we find Plaintiffs' third issue regarding damages to be dispositive of the second issue regarding the dismissal of this claim. We therefore proceed to analysis of the trial court's findings regarding damages.

## VI.    Damages

Plaintiffs sought an award of compensatory damages in the amount of $419,105. Plaintiffs contend that any benefits they anticipated from the contractual relationship with Wendy's that were delayed by the McGrady Drive Franchise's opening approximately ten months later than Plaintiffs expected were lost due to Defendants' interference. Likewise, Plaintiffs argue that additional expenses they encountered in developing the McGrady Drive Franchise during those ten months were caused by Defendants' interference. We conclude that the evidence does not preponderate against the trial

court's finding that Plaintiffs failed to prove damages attributable to Defendants' intentional interference with the business relationship between Plaintiffs and Wendy's.

Damages recoverable for a successful claim of intentional interference with business relationships include "'(a) the pecuniary loss of the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.'" *B & L Corp. v. Thomas & Thorngren, Inc.*, 162 S.W.3d 189, 222 (Tenn. Ct. App. 2004) (quoting *Dorsett Carpet Mills, Inc. v. Whitt Tie & Marble Distrib. Co.*, 734 S.W.2d 322, 324-25 (Tenn. 1987) (in turn quoting with approval Restatement (Second) of Torts § 774A)).

The trial court in its May 2014 Memorandum Opinion and Order stated the following specific findings of fact and conclusions of law regarding the interference claim in relevant part:

The Appeal to Wendy's.

As (perhaps) admitted by Plaintiffs, the Defendants had every right to object to the proposal to build a new restaurant so close [to] its 25th Street location. Initially this was the only reason listed for Defendants' objection to the new franchise and restaurant sought by the Plaintiffs.

Wendy's Guidelines [allow] the Defendants' objection. The Defendants had been adversely impacted at their Fort Oglethorpe [Georgia] store [by] a Wendy's company store of around $120,000.00. Trial Exhibit 65 at 68. The impact study for the new restaurant estimated a 7% impact. The fact that Wendy's allowed the two step appeal <u>and</u> the impact study cannot ultimately be blamed on the Defendants because it was Wendy's, through Mr. Nelson, that allowed the impact study while acknowledging that such was not normally allowed where the appeal route had been pursued.

The Covenant Not to Compete.

The Plaintiffs argue that the delay in opening the Cleveland restaurant was due to the Defendants' use of the NCA. Despite Mr. [McRae's] earlier letter of March 2, 2010, there is <u>no</u> evidence that the Defendants mentioned the NCA issue to Wendy's before the meeting in Atlanta on May 10, 2010. The court excluded the part of the letter that referred to "Wendy's officials had mentioned the NCA issue" to Mr.

26

Abbasi as hearsay. Trial Exhibit 9. There was <u>no</u> admissible evidence that Wendy's heard of the NCA before May 10, 2010.

It seems clear to the court that, at best from Plaintiffs' point of view, the NCA was in the mix from May 10, 2010 until June 8, 2010, when the court entered the TRO. Wendy's may have decided by June 2, 2010 that the NCA was not an issue for it. On June 10, 2010 the Defendants advised Wendy's that it would abide by the court's order. Before then, or at least within days of such, Wendy's position was that it was not going to decide the legality of the NCA, that the NCA issue was between the franchisees, and that Wendy's was going to decide on the site without considering the NCA.

Indeed, it seems to the court that the delay in granting the franchise was caused more by Wendy's than the Defendants. Wendy's waited for the results of the Encroachment Study before determining and advising both franchises on Plaintiffs' SAR. On July 9, 2010, Wendy's advised both parties of the results of the Impact Study. Trial Exhibits 34 and 35. On July 19, 2010, Wendy's [gave] Plaintffs' SAR approval for the McGrady Road location. Trial Exhibit 36. This letter advised Mr. Abbasi that all construction plans should be submitted to Bob Skinner, Director of Engineering, for approval. Cindy Wallace sent Mr. Abbasi an e-mail on July 26, 2010 of the material he needed to produce for the Franchise Review Council.

Kamal Alghoul on July 29, 2010 expressed his displeasure to Wendy's about the impact study. Trial Exhibit 40. On August 10, 2010, Wendy's advised him that his July 29, 2010 letter was considered a request for a second level appeal, that his appeal was denied, and that there were no more appeals. Trial Exhibit 40.

The court noted the Franchise's acceptance of the new franchise agreement on September 8, 2010. However, Wendy's had the Agreement be effective on September 30, 2010, 22 days later.

The court also notes the delay between September 30, 2010 and December 30, 2010, when Plaintiffs applied for the land disturbance permit. This is a three month period of time. Further, it took Mr. Skinner almost three months to approve Plaintiffs' site plan and proposed construction plans. Even though Plaintiffs applied for the building permit

27

on October 25, 2010, the City of Cleveland, Tennessee did not issue the permit until December 30, 2010. Trial Exhibit 57.

A Plaintiff is under a duty to mitigate his/her/its damages. *Memphis Light, Gas & Water Div. v. Starkey*, 244 S.W.3d 344, 353 (Tenn. Ct. App. 2007). There was no testimony explaining why the Plaintiffs waited so long to develop Rockmart first, especially given the fact that there was no objection to that franchise and restaurant.

Mr. Abbasi said the new store should be open within 2-3 months after the SAR is approved. Mr. Abbasi has objected "many times" to new stores being opened near an existing restaurant. Many turned out to be few. It appeared he figured out Wendy's general position and that appealing usually did not change Wendy's tentative decision.

The Construction Contract for the Cleveland store was typed January 1, 2011 and signed on January 4, 2011. The equipment in the car wash had to be removed and then the building had to be demolished. The grade of the site had to be lowered two feet. An unplanned retaining wall had to be built. The building was damaged by a tornado(s) in April of 201[1]. The damage had to be repaired. [The court was uncertain how a completed building would not have been damaged by the same tornado and such was not explained by the Plaintiffs' proof.] It was also necessary to secure 11 additional parking places from Bi-Lo for use by the new restaurant.

Cleveland's Certificate of Occupancy was dated June 8, 2011. It took much longer than 82 days to construct the new restaurant. Mr. Abbasi has said construction could be completed within 82 days. Mr. Keith testified it sometimes is more difficult to work in cold weather [than] hot weather.

Ultimately, the court holds that the Plaintiffs failed to prove that the mention or use of the NCA resulted in any more delay than occurred otherwise as a result of the rights granted to the objecting franchisee by Wendy's. Here, Wendy's held the SAR request for 5 to 6 weeks before notifying the Defendants of their rights to object under the Guidelines. Wendy's did not give final, formal approval to Plaintiffs' SAR until July 19, 2010, more than five weeks after the court's TRO, the Defendants' acceptance of the TRO, and the Defendants' [surrendering] any claim to Wendy's that the NCA was a basis to deny a new franchise.

28

\* \* \*

The Plaintiffs have not proved damages due to the fact that the NCA was on Wendy's radar for only a short period of time and was gone. The NCA had been removed as an issue <u>before</u> Wendy's approved the Plaintiffs' SAR. The SAR was determined only after the impact study was completed.

\* \* \*

The court holds that even if Kamal Alghoul tried to interfere with the new franchise sought by Plaintiffs, he was unsuccessful. Further, the delay was due to the processes outlined and allowed by Wendy's. The issue of the NCA was mentioned and taken off the table during the time Plaintiffs' SAR was being considered.

(Emphasis in original; paragraph numbering omitted.) Upon a careful and thorough review of the record, we conclude that the evidence does not preponderate against the trial court's findings regarding this issue.

Wendy's representative Joseph Keith testified through deposition that in the absence of objections by other franchisees, the approval process would typically take three to six weeks from Wendy's issuance of a real estate letter to approval of an SAR. He further estimated that it would typically take Plaintiffs 110 days to build a new store. Mr. Keith also testified, however, that when an existing franchisee objects to a proposed franchise, the process "can take . . . maybe five to ten months depending on what transpires in between and how long it takes people to respond, including the people doing the third party study." Mohammed Abbasi testified that prior to Defendants' initiating the objection process, he had expected to open the McGrady Drive Franchise by July 2010 rather than only receiving approval from Wendy's to build the franchise on July 19, 2010.

Plaintiffs argue that they are entitled to compensation for the following specific damages:

| | |
|---|---|
| Lost net profits for ten months, estimated at $33,950 per month: | $339,500 |
| Six months of rent under the McGrady Drive ground lease: | 18,000 |
| Loss of time-sensitive construction discount: | 11,800 |
| Additional construction costs incurred in 2011: | 49,805 |
| Total: | $419,105 |

29

Plaintiffs presented uncontroverted evidence demonstrating that they had incurred the above expenses prior to the opening of the McGrady Drive Franchise on June 8, 2011. First, Springfield's accountant, Robert Frost, testified that he valued Plaintiffs' lost net profits for the ten months between August 2010 and June 2011 by averaging the monthly net profit earned by the McGrady Drive Franchise during its first year in operation and applying a reduction to allow for typically increased sales in the first two months of a store's opening.

Second, the terms of the ground lease for the McGrady Drive site, executed on February 3, 2010, indicated that Plaintiffs would begin paying $3,000 in monthly rent either upon opening of the restaurant or completion of stipulations not relevant here, but under no circumstances later than October 1, 2010. Mr. Frost testified that Plaintiffs lost the benefit of their negotiated six-month, rent-free time period when they began paying rent on October 1, 2010, without realizing profits from the restaurant until June 2011.

Third, Plaintiffs' building contractor, Dan Bramlett, testified that he had offered Plaintiffs a discount valued at $11,800 if he could complete construction on the McGrady Drive Franchise consecutively with construction on a Wendy's restaurant that Plaintiffs were developing in Rockmart, Georgia. Mr. Bramlett explained that by the time Plaintiffs were ready to break ground on the McGrady Drive site in January 2011, he had already built the Rockmart site, encountered unexpected costs there, and was not able to send his crew directly from one site to the other as he had originally planned. Mr. Bramlett therefore no longer offered the construction discount to Plaintiffs.

Finally, Mr. Bramlett testified that Plaintiffs incurred $49,805 in construction costs for the McGrady Drive site in the spring of 2011 that they would not have incurred if construction had been completed in 2010. According to Mr. Bramlett, this cost was incurred when TDOT lowered McGrady Drive in February to March 2011, requiring Plaintiffs' McGrady Drive site to be "dropped" two feet. Mohammed Abbasi corroborated this testimony. Mr. Bramlett explained that TDOT would have adjusted the road to the site if the restaurant had already been built.[4]

The flaw in Plaintiffs' argument is that although they demonstrated that these expenses were incurred between August 2010 and June 2011, they failed to demonstrate that the expenses were caused by any interference by Defendants beyond that allowed by the process delineated in Wendy's Guidelines. As the trial court explained, the admissible evidence demonstrated that the NCA was an issue considered by Wendy's for only one month, from the time of the meeting between Kamal Alghoul and Wendy's

---

[4] As the trial court noted, Mohammed Abassi also testified that he paid $5,000 toward an uncovered insurance deductible to repair tornado damage suffered by the unfinished restaurant in April 2011. Plaintiffs have not included this amount, however, in their summary of compensable damages.

officials on May 10, 2010, through entry of the temporary restraining order on June 8, 2010.

Kamal Alghoul requested the May 10, 2010 meeting following his receipt of Wendy's May 5, 2010 notification that it had preliminarily approved the McGrady Drive site. Wendy's subsequently sent Defendants a letter on May 13, 2010, demanding production of the NCA by May 19, 2010. This deadline followed Wendy's May 5, 2010 approval of the McGrady Drive site by twelve days, only two days more than the amount of time allowed by Wendy's Guidelines for an objecting franchisee to either request an impact analysis or a first-level appeal. Within that timeframe, Defendants, acting through Mr. Schram, responded on May 18, 2010, by requesting a first-level appeal, "reserving" their right to request an impact analysis, and attaching the NCA. It was then Wendy's decision, expressed through Mr. Nelson in his letter dated May 27, 2010, to extend the deadline for Defendants to request an impact analysis. Wendy's subsequently accepted Defendants' paperwork and payment needed to commence an impact analysis on June 7, 2010.

A thorough review of the record indicates that Wendy's essentially followed the procedures set forth in its Guidelines with the exception of what was ultimately a two-week time extension allowed to Defendants to request an impact study. It would have been within Wendy's discretion under its Guidelines to deny Defendants any extension of time to request an impact study and treat the May 18, 2010 letter, which had been timely submitted by Defendants, as a request for a first-level appeal without an impact study. Wendy's actions in implementing the development and objection process according to its Guidelines, including the decision to grant this extension, cannot be attributed to Defendants. In addition, Defendants were not involved in the development process in any way during the ten months between denial of the second-level appeal on August 10, 2010, and the eventual opening of the McGrady Drive Franchise on June 8, 2011.

Wendy's Guidelines repeatedly emphasize, as several witnesses attested, that no Developing Franchisee can be assured of franchise rights until a Unit Franchise Agreement is executed. We conclude that the evidence does not preponderate against the trial court's finding that "the delay was due to the processes outlined and allowed by Wendy's" and that therefore the compensable damages claimed by Plaintiffs cannot be attributed to any intentional interference on Defendants' part. The trial court did not err by dismissing Plaintiffs' claim for intentional interference with business relationships.[5]

---

[5] We recognize Plaintiffs' argument that the trial court's judgment against Defendants in the amount of $500 was contradictory to its dismissal of the claim for intentional interference with business relationships. However, Defendants have not raised the issue of the trial court's judgment against them for nominal damages and have not sought to defend against the judgment. We therefore do not address this aspect of the trial court's judgment on appeal. *See* Tenn. R. App. P. 13(b).

## VII. Conclusion

For the reasons stated above, we affirm the judgment of the trial court. The costs on appeal are assessed against the appellants, Springfield Investments, LLC; Global Southern Realty Holdings, LLC; and Mohammed Abbasi, individually. This case is remanded to the trial court, pursuant to applicable law, for collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE